**ST. PAUL FIRE AND MARINE INSURANCE COMPANY,**
Petitioner,

v.

**Edward ROCHE, Plenary Guardian of the Person and Estate of Diane Roche, an Incapacitated person, and in his own right and William J. Scharfenberger, Trustee Allegheny Health, Education and Research Foundation and Allegheny University Hospitals, East, Including its wholly owned operating division, Allegheny University Hospital–Hahnemann Division and Lexington Insurance Company c/o Caronia Corporation and Medical Professional Liability Catastrophe Fund and John Reed Director of the Medi-**

**cal Professional Liability Catastrophe Fund and Allegheny Health Services Providers Insurance Company, Ltd. and Continental Casualty Company and Steadfast Insurance Company,**
Respondents.

Commonwealth Court of Pennsylvania.

Argued Sept. 9, 2002.
Decided Oct. 21, 2002.

Denise M. Brinker and Robert R. Reeder, Philadelphia, for petitioner.

Guy A. Donatelli, West Chester, for respondent Medical Professional Liability Cat. Loss Fund.

George F. Schoener, Philadelphia, for respondent, E. Roche.

H. Carter Redd, Richmond, VA, for respondent, Allegheny Univ. Hosp. Hahnemann Division.

Melvin R. Shuster, Philadelphia, for respondent, Steadfast Insurance Co.

Stephen P. Chawaga, Philadelphia, for respondent, Lexington Insurance Co.

Stephanie Tyler Schmelz, Washington, DC, for respondent, Continental Casualty Co.

Susan D. Colatsky, Philadelphia, for respondent, Allegheny Health Serv. Providers Insurance Co.

BEFORE: COLINS, President Judge, FRIEDMAN, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge FRIEDMAN.

St. Paul Fire and Marine Insurance Company (St.Paul) has filed a declaratory judgment action in this court's original jurisdiction against the following Respondents: (1) Edward Roche, Plenary Guardian of the Person and Estate of Diane Roche, an Incapacitated Person, and in His Own Right (Roche); (2) William J. Scharfenberger, Trustee Allegheny Health, Education and Research Foundation and Allegheny University Hospitals, East, Including Its Wholly Owned Operating Division, Allegheny University Hospital–Hahnemann Division (AHERF); (3) Lexington Insurance Company (Lexington); (4) Medical Professional Liability Catastrophe Fund, and John Reed Director of the Medical Professional Liability Catastrophe Fund (CAT Fund); (5) Allegheny Health Services Providers Insurance Company, Ltd. (AHSPIC); (6) Continental Casualty Company (Continental); and (7) Steadfast Insurance Company (Steadfast). Roche has filed a cross-claim against the CAT Fund. Multiple parties have filed

motions for summary judgment, which are now before this court for disposition.[1]

On September 9, 1997, Diane Roche was admitted to Hahnemann University Hospital (Hahnemann) for surgery. She tolerated the surgery well and was awaiting discharge on September 22, 1997. When her central venous pulmonary (CVP) line was discontinued, she became disoriented and went into cardiac arrest. Although she was resuscitated, she suffered brain damage and remains in a persistent vegetative state. (AHERF's Motion for Summary Judgment (AHERF's Motion), Exh. 2 at 3; Exh. 12.)

In September 1997, AHERF had "claims made" primary liability insurance coverage for Hahnemann through Lexington and excess coverage through St. Paul. In 1998, these policies were terminated, and AHERF obtained "claims made" primary liability insurance coverage from Steadfast and AHSPIC and excess coverage through St. Paul and Continental. (AHERF's Motion, Exh. 2 at 1–2.)

In April of 1998, Roche filed a lawsuit against AHERF, which was settled in March of 2001 for $15 million. During the course of the litigation, there was a dispute as to which of the insurance companies would be liable for damages. AHERF, Lexington, Steadfast, AHSPIC and Continental believed that the claim was made in 1997; St. Paul believed that the claim was made in 1998, which, if true, would lessen St. Paul's liability. (AHERF's Motion, Exh. 2 at 2–3.) In December of 2000, St. Paul filed a declaratory judgment action with this court to determine the issue.

Roche filed a cross-claim against the CAT Fund. Under the settlement agreement, the CAT Fund was to pay $900,000 in coverage on behalf of AHERF. However, the CAT Fund subsequently informed Mr. Roche that it already had paid $600,000 of AHERF's semi-annual aggregate of $1,350,000 for the period from July 1, 1997, to December 31, 1997, leaving only $750,000 for payment of the Roche claim. The CAT Fund agreed to pay the $750,000 and litigate the remaining $150,000 in this court.

## I. Year of Claim

The first issue is whether Respondents are entitled to summary judgment because the Roche claim was made in 1997, or whether St. Paul is entitled to summary judgment because the Roche claim was made in 1998.

St. Paul's 1997 excess insurance policy with AHERF contains the following provision:

When your Immediate Underlying Insurance is written on a claims-made basis, we'll apply this agreement to claims or suits for covered damages only *when they're first made or brought:*

● while this agreement is in effect; and

● *in accordance with the applicable claims-made provisions of your Underlying Insurance.*

(Appendix of Exhibits, Exh. 1 at 138) (underline added). Thus, in order to determine when the Roche claim was first made under St. Paul's policy with AHERF, we

---

1. A party may move for summary judgment whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report. Pa. R.C.P. No. 1035.2(1). The adverse party may not rest upon the mere allegations or denials of the pleadings but must

file a response identifying one or more issues of fact arising from evidence in the record controverting the evidence cited in support of the motion or from a challenge to the credibility of one or more witnesses testifying in support of the motion. Pa. R.C.P. No. 1035.3(a)(1).

must examine the "applicable claims-made provisions" of the underlying Lexington policy.

Section III.A. of the Lexington policy governs when a claim is to be considered as first made.

A. When claim is to be considered as first made:

A claim for injury shall be considered as being first made at the *earlier* of the following times:

a. When written notice of claim for injury is first made against the **Named Insured** or any Insured and such notice is received by the Company.

b. When the **Named Insured** or any Insured *first gives written notice of a potential claim and such notice is received by the Company [Lexington[2]]* of specific circumstances involving an [sic] particular person, which may reasonably result in a claim for injury under this policy, or

c. When the Company establishes a potential claim file based on oral or written notice.

(Appendix of Exhibits, Exh. 5 at 22) (bold in original, underline added). We begin by considering when the Roche claim was made under Section III.A.b of the Lexington policy.

The evidence shows that Tim McSorley, a nurse who worked in the cardiac care unit at Hahnemann, orally reported the Roche incident to Janice Hudson in the risk management department on September 24, 1997. Ms. Hudson wrote down the details of the McSorley call on a "Risk Management Referral" form.[3] Ms. Hudson then gave the referral form to Larry D. McCusker, Director of Risk Management at Hahnemann, who identified the matter as a "Level 3 Incident," i.e., a potential claim, and assigned the case to Diane James. Ms. James established a file, conducted an investigation and, on November 25, 1997, prepared her report on a "Transmittal Form" addressed to Brenda Waiter, Esquire, Associate General Counsel. Mr. McCusker reviewed the report, and, on November 26, 1997, Ms. James prepared a final copy for transmission to Attorney Waiter. However, November 26, 1997, was Ms. James' last day working in the risk management department. Having completed her report, she left the matter in the hands of Mr. McCusker. (AHERF's Motion, Exh. 9 at 30–31, 37–40, 66, 97; Exh. 12; Exh. 14; Appendix of Exhibits, Exh. 6; Exh. 9 at 118.)

There is no question that, on September 24, 1997, Mr. McCusker, the Director of Risk Management at Hahnemann, received written notice of a potential claim. The next question is whether this constitutes receipt of written notice by the "Company" under Section III.A.b.

Section XII of the Lexington policy states that "an **Insured** *shall comply with the provision of this policy requiring notice to the Company* of claims, suits or incidents *by giving notice* thereof *to the Office of the General Counsel of [AH-*

---

2. The word "Company" in the Lexington policy refers to Lexington. (Appendix of Exhibits, Exh. 5 at 2.)

3. In the portion of the form titled "Reason for Referral," Ms. Hudson wrote:

31 YO      Pt on Pulmonary Floor. Central line being disconnected for discharge. Pt suddenly coded. Massive infarct. Now persistent vegetative state. PE [pulmonary embolism] R/O [ruled out] via Ct Scan, but Pt is "posturing" which is indicative of brain damage.... Husband extremely upset. States RN's on 19th were aware of Pt complaints of CP [chest pain?] all day prior to infarct and did nothing about it.

(AHERF's Motion, Exh. 10 at 39; Exh. 12.)

*ERF]."* (Appendix of Exhibits, Exh. 5 at 25) (bold in original, underline added).

■ The record shows that risk management was a function of the Office of General Counsel of AHERF. According to Mr. McCusker's job description, he worked in the "Risk Management/Legal Affairs" department. His responsibilities included: (1) managing all aspects of the incident/claims management process; (2) determining the level of each incident; (3) rendering an opinion regarding potential liability exposure; (4) recommending a dollar reserve amount; (5) informing the Regional Director of Risk Management of all level three incidents upon receiving notice of such incidents; (6) preparing responses to interrogatories, complaints and other legal documents as requested from the assigned defense attorney; (7) participating in the preparation of medical staff and employees for deposition or testimony at trial; (8) attending depositions and trials as directed by the Regional Director for Risk Management; (9) preparing all correspondence in response to plaintiff and defense attorneys regarding incidents or claims; (10) conducting claims settlement negotiations as directed by Senior Counsel; and (11) *acting as the primary contact for receipt of appropriate documents presented by a process server.* Mr. McCusker reported to Cynthia Beckman, Regional Director for Risk Management; Ms. Beckman reported to Emily Jean Lucid, M.D., Vice President for Risk Management; and Dr. Lucid reported to Nancy A. Wynstra, Executive Vice President and General Counsel for AHERF. (AHERF's Motion, Exh. 7; Exh. 10 at 38, 58; Exh. 11 at 176, 178–79, 194; Collective Appendix, Exh. 29 at 118, 125–27.)

Thus, the evidence shows clearly that Mr. McCusker played an integral role within the Office of General Counsel. Most significant is the fact that Mr. McCusker acted as the primary contact for receipt of appropriate documents by a process server. In other words, it was Mr. McCusker's *job* to receive written notice of a claim against Hahnemann on behalf of the Office of General Counsel of AHERF. We conclude, then, that when Mr. McCusker received written notice of a potential claim against Hahnemann on September 24, 1997, the Office of General Counsel of AHERF received written notice of a potential claim. Because notice received by the Office of General Counsel is notice received by the "Company" under Sections III.A.b and XII of the Lexington policy, the Roche claim was first made in 1997.

Accordingly, the motions for summary judgment filed by the various Respondents are granted, and St. Paul's motion for summary judgment is denied.[4]

## II. Semi–Annual Aggregate

The second issue is whether the CAT Fund's establishment of a semi-annual aggregate of $1,350,000 is contrary to section 701(d)(1) of the Health Care Services Malpractice Act (Malpractice Act), Act of Oc-

4. We have based our decision on Section III.A of the Lexington policy because Section III.A specifically governs when a claim is first made. As indicated above, St. Paul's excess policy covered "claims first made ... in accordance with the applicable claims-made provisions" of the Lexington policy. (Appendix of Exhibits, Exh. 1 at 138.) Although we note that Section III.E of the Lexington policy provided for the compilation of a final list of potential claims made in 1997 and that the Roche claim was not on that list, Section III.E is *not* an "applicable claims-made provision" because it does not address in any manner when a claim is first made. Indeed, the fact that a list of claims must be compiled does not provide any guidance as to when a claim is first made. (*See* Appendix of Exhibits, Exh. 5 at 22.)

tober 15, 1975, P.L. 390, *as amended*, 40 P.S. § 1301.701(d)(1), which requires establishment of an annual aggregate of $2,700,000.

■ Section 701(d)(1) of the Malpractice Act provides as follows:

> For the *calendar years 1997* through 1998, the limit of liability of the [CAT Fund] shall be $900,000 for each occurrence for each health care provider and *$2,700,000 per annual aggregate* for each *health care provider.*

40 P.S. § 1301.701(d)(1) (emphasis added). Here, the policy in question covered only July 1, 1997 to December 31, 1997; on that basis, the CAT Fund concluded that AHERF's annual aggregate could be only $1,350,000. However, section 701(d)(1) of the Malpractice Act does not authorize the CAT Fund to reduce the annual aggregate where a particular policy does not run from January 1, 1997 to December 31, 1997. Section 701(d)(1) of the Malpractice Act provides an annual aggregate for each "health care provider," not for a particular insurance policy purchased by the health care provider.[5]

Accordingly, Roche's motion for summary judgment with respect to the interpretation of section 701(d)(1) of the Malpractice Act is granted.

### III. Estoppel

Now that we have determined the proper interpretation of section 701(d)(1) of the Malpractice Act, the CAT Fund states that if it were to apply an annual aggregate of $2,700,000 instead of a semi-annual aggregate of $1,350,000, the amount remaining for Hahnemann for the entire 1997 calendar year would be $775,000 instead of

$750,000. (*See* Cat Fund brief at 5 n. 2.) Although $775,000 is $25,000 more than $750,000, it still falls short of the $900,000 promised under the settlement agreement. The final issue is whether the CAT Fund is estopped from denying its liability for $900,000 of coverage.

■ It is the law of the Commonwealth of Pennsylvania that the Commonwealth cannot be estopped by the acts of its agents and employees if those acts are in violation of positive law. *Central Storage & ·Transfer Company v. Kaplan*, 487 Pa. 485, 410 A.2d 292 (1979). Because the CAT Fund cannot be held liable for more than the statutory limit of $2,700,000 for 1997, and because there is only $775,000 remaining of that amount, the CAT Fund is not estopped from denying liability for $900,000.

Accordingly, Roche's motion for summary judgment with respect to the estoppel issue is denied.

### ORDER

AND NOW, this 21st day of October, 2002, it is hereby ordered as follows:

1. Respondents' motions for summary judgment, contending that the claim in question was first made in 1997, are granted.

2. Petitioner's motion for summary judgment, contending that the claim in question was first made in 1998, is denied.

3. The motion for summary judgment filed by Edward Roche, Plenary Guardian of the Person and Estate of Diane Roche, an Incapacitated Person, and in His Own Right (Roche), relating to the proper inter-

---

**5.** In contrast, section 701(a)(1)(i) of the Malpractice Act specifically states, *"For policies issued or renewed in the calendar years 1997 through 1998, a health care provider ... shall annually insure....*" 40 P.S. § 1301.701(a)(1)(i) (emphasis added). This provision specifically refers to the insurance policies; section 701(d)(1) of the Malpractice Act refers to the health care providers.

pretation of section 701(d)(1) of the Health Care Services Malpractice Act, Act of October 15, 1975, P.L. 390, *as amended,* 40 P.S. § 1301.701(d)(1), is granted.

4. Roche's motion for summary judgment relating to estoppel is denied.

DISSENTING OPINION BY President Judge COLINS

I respectfully dissent from the well-researched and reasoned opinion of the majority.

I cannot agree with the legal conclusion that notice to Mr. McCusker was tantamount to notice to the Office of General Counsel of AHERF. Therefore, I would grant summary judgment in favor of Petitioner, St. Paul, on the grounds that the claim in question was first made in the year 1998.